IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:20-CV-474-D

COLORADO BANKERS LIFE            )
INSURANCE COMPANY, et al.,       )
                                 )
            Plaintiffs,          )
                                 )                    **ORDER**
      v.                         )
                                 )
ACADEMY FINANCIAL ASSETS, LLC,   )
                                 )
            Defendant.           )

On September 3, 2020, Colorado Bankers Life Insurance Company ("Colorado Bankers"),

Southland National Insurance Corporation ("Southland National"), and Bankers Life Insurance

Company ("Bankers Life") (collectively, "plaintiffs") filed a complaint against Academy Financial

Assets, LLC ("AFA") alleging breach of contract concerning an Interim Amendment to Loan

Agreements ("IALA") [D.E. 1]. On September 30, 2020, AFA answered the complaint and filed

a counterclaim against Colorado Bankers, Southland National, and Bankers Life alleging that the

court must reform the IALA to reflect the parties' intent to include certain promissory notes in a

list of non-interest bearing loans [D.E. 11]. On November 20, 2020, plaintiffs moved to dismiss

the counterclaim for failure to state a claim upon which relief can be granted [D.E. 17]. On

December 8, 2020, plaintiffs moved to consolidate this case with 25 related cases concerning

alleged breaches of the IALA [D.E. 19]. On July 20, 2021, this court denied plaintiffs' motion to

dismiss the counterclaim and motion to consolidate [D.E. 26]. On August 3, 2021, plaintiffs

answered the counterclaim [D.E. 28].

On May 5, 2023, the court consolidated the cases for dispositive motions practice and trial under case number 5:20-CV-474 [D.E. 77]. On November 15, 2023, AFA voluntarily dismissed without prejudice AFA's counterclaims against Southland National [D.E. 84].

On November 17, 2023, 22 of the 24 consolidated defendants moved for partial summary judgment on plaintiffs' breach of contract claim [D.E. 85] and filed a memorandum, statement of material facts, and appendix in support [D.E. 86–88]. On November 20, 2023, plaintiffs moved for summary judgment on liability for their breach of contract claim, on defendants' counterclaims, and to foreclose collateral [D.E. 89] and filed a memorandum, statement of material facts, and appendix in support [D.E. 90–93]. On December 18, 2023, plaintiffs responded in opposition to defendants' motion for partial summary judgment and responded to defendants' statement of material facts [D.E. 98–99]. The same day, defendants responded in opposition to plaintiffs' motion for summary judgment and responded to plaintiffs' statement of material facts [D.E. 100, 101]. On January 2, 2024, defendants and plaintiffs replied [D.E. 105, 106, 107]. On January 29, 2024, defendants filed a notice of decision in related cases [D.E. 109]. On March 15, 2024, plaintiffs filed a supplemental declaration in support of their motion for summary judgment [D.E. 113, 114]. As explained below, the court grants plaintiffs' motion for summary judgment concerning defendants' liability for breach of contract and defendants' counterclaims, denies plaintiffs' request to foreclose on collateral, and denies defendants' motion for partial summary judgment.

I.

The court understands the relationship between the parties in these cases. See Colo. Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC, No. 5:20-CV-185, 2021 WL 6064843, at *1–2 (E.D.N.C. Dec. 22, 2021) (unpublished), aff'd, 60 F.4th 148 (4th Cir. 2023). Colorado Bankers,

2

Southland National, and Bankers Life are licensed North Carolina domestic life and accident and health insurers that Greg Lindberg ("Lindberg") owns. See Plaintiffs' Statement of Material Facts ("PSMF") [D.E. 91] ¶ 1; Defendants' Opposing Statement of Material Facts ("DOSMF") [D.E. 101] ¶ 1. Lindberg is the sole shareholder of Global Growth Holdings, Inc., and Lindberg or Global Growth Holdings, Inc. own other insurance companies and hundreds of other non-insurance companies (the "affiliates"). See PSMF ¶ 2; DOSMF ¶ 2. Under Lindberg's control, plaintiffs provided over $1.2 billion to the affiliates through various loans and other debt and equity financing arrangements. See PSMF ¶ 7; DOSMF ¶ 7.

During an audit, the North Carolina Department of Insurance ("DOI") became concerned that plaintiffs may not be able to meet obligations to policyholders due to the concentration of affiliated company debt. See PSMF ¶ 9; DOSMF ¶ 9. On October 18, 2018, after unsuccessfully attempting to develop remediation plans to address the DOI's concerns, plaintiffs consented to the DOI's administrative supervision. See PSMF ¶ 10; DOSMF ¶ 10. When the DOI's administrative supervision did not adequately resolve the concentration of affiliated debt, plaintiffs consented to rehabilitation, a form of insurance receivership under Chapter 58 of the North Carolina General Statutes. See PSMF ¶ 13; DOSMF ¶ 13.

The appointed rehabilitator attempted to restructure plaintiffs' debts and obligations to enable plaintiffs to return to going-concern status. See N.C. Gen. Stat. § 58-30-85(c); PSMF ¶ 16; DOSMF ¶ 16. On June 27, 2019, plaintiffs executed three interconnected agreements with Lindberg and the affiliates: a Memorandum of Understanding ("MOU"), a Revolving Credit Agreement ("Revolver"), and the IALA. See PSMF ¶ 17; DOSMF ¶ 17. The MOU restructured Lindberg's affiliates and placed the affiliates under the control of an independent board in order to protect the policyholders' interests. See PSMF ¶ 19; DOSMF ¶ 19. The Revolver between

3

Colorado Bankers and AFA provided a $40 million revolving credit facility to AFA to help prevent affiliates from defaulting before restructuring. See PSMF ¶ 20; DOSMF ¶ 20.

This court already entered judgment on two breach of contract claims against AFA concerning the Revolver. See Colo. Bankers Life Ins. Co., 2021 WL 6064843, at *3–7, aff'd, 60 F.4th 148 (4th Cir. 2023). This order concerns alleged breaches of the IALA.

The IALA amended the payment terms of the debt that the affiliates owed to plaintiffs and other insurance company lenders. See PSMF ¶ 21. The IALA included short-term debt relief to the affiliates by deferring interest for six months, reducing interest rates on the underlying debt, and extending the loan terms. See id.; DOSMF ¶ 21.

The IALA identified all debt that the affiliates owed to plaintiffs and grouped the debt into seven tranches: (1) senior loans, (2) junior loans, (3) preferred equity, (4) Agera financing documents, (5) PB Life and Annuity Code, Ltd. ("PBLA") loans, (6) loans excluded from North Carolina Insurance Companies ("NHC"), and (7) insurance hold co-related debt. See PSMF ¶¶ 34–35; DOSMF ¶¶ 34–35. The IALA included amendments to the seven tranches of debt's repayment terms. See PSMF ¶ 38; DOSMF ¶ 38. The IALA's exhibits explain the terms and modifications of any particular loan or affiliated debt instrument. See PSMF ¶ 39; DOSMF ¶ 39. The IALA reduced the interest rate on some of the tranches of affiliated debt and eliminated the payment of interest on other tranches. For example, the IALA deferred interest on the senior loan tranche for six months and reduced the interest to 5% per year. See PSMF ¶ 45; DOSMF ¶ 45. For the Agera loans, the PBLA loans, and the insurance hold co-related debt, the IALA eliminated accrual and payment of interest during the IALA's term. See PSMF ¶ 46; DOSMF ¶ 46. Thus, if a loan was scheduled in the insurance hold co-related debt in IALA Exhibit G, no interest would accrue or be payable on it during the IALA's term. See PSMF ¶ 46; DOSMF ¶ 46.

4

These consolidated cases concern loan agreements that Exhibit A to the IALA identifies as senior loans. See PSMF ¶ 47; DOSMF ¶ 47. Section One of the IALA describes the amendments to the repayment terms of the senior loans. See PSMF ¶ 52; DOSMF ¶ 52. In relevant part, Section One states:

> (a) for the first six (6) month period following the Amendment Effective Date (the "Senior Loan Deferral Period"), each of the Senior Loans shall accrue interest at the Base Interest Rate as set forth herein, but the accrued interest on each Senior Loan shall not be payable and instead shall be added to the principal of the applicable Senior Loan upon the end of the Senior Loan Deferral Period; (b) after the Senior Loan Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate; (c) beginning February 1, 2020, interest on the Senior Loans shall be payable quarterly in cash at the Base Interest Rate as set forth herein; (d) from and after the Amendment Effective Date, any prepayment penalties in the Senior Loans shall equal zero percent (0%); and (e) the maturity date of each Senior Loan shall be December 31, 2029.

[D.E. 94] 63–64; see PSMF ¶ 52; DOSMF ¶ 52. On June 27, 2019, the IALA took effect, and the senior loan deferral period began on July 1, 2019. See PSMF ¶ 57; DOSMF ¶ 57. The IALA included a "Representations and Warranties" clause where the parties represented and warranted the accuracy of the Recitals in the IALA and its exhibits. See PSMF ¶ 40; DOSMF ¶ 40. The relevant senior loans state that failure to pay interest when due is an "Event of Default." PSMF ¶ 65; see DOSMF ¶ 65. Upon an event of default, all obligations under the loans may be declared immediately due and payable. See PSMF ¶ 66; DOSMF ¶ 66.

On February 1, 2020, no defendants had made an interest payment. Compare PSMF ¶ 64, with DOSMF ¶ 64. On March 13, 2020, on behalf of plaintiffs, special deputy rehabilitator Mike Dinius ("Dinius") sent each borrower a letter providing notice of default based on the failure to make the interest payment due on February 1, 2020, and demanded payment of the amount owed within five business days to cure the default. See PSMF ¶ 67; DOSMF ¶ 67. Dinius, however, did not declare all obligations immediately due and payable. See PSMF ¶ 67; DOSMF ¶ 67. On

5

March 18, 2020, defendants sent plaintiffs a response stating that the IALA did not require the first interest payment until May 1, 2020, not February 1, 2020. See PSMF ¶ 68; DOSMF ¶ 68.

On May 1, 2020, plaintiffs received 20 wire payments from AFA in the amount of $6,568,179, and four other wire payments from other borrowers in the amount of $336,174.33. See PSMF ¶ 69; DOSMF ¶ 69. These payments were for the interest due for the senior loans on May 1, 2020. See PSMF ¶ 69; DOSMF ¶ 69. On May 4, 2020, the third-party administrator for plaintiffs emailed Global Growth Holdings's treasury department asking for details on how plaintiffs should apply the payments across the outstanding debt accounts. See PSMF ¶ 72; DOSMF ¶ 72. Plaintiffs and the affiliates could not agree on whether defendants clarified how to apply the payments among the senior loan accounts. Compare PSMF ¶¶ 71–75, with DOSMF ¶¶ 71–75.

On July 31, 2020, and August 3, 2020, Colorado Bankers and Bankers Life received wire payments from AFA and other affiliates for the interest payments due on the senior loans on August 1, 2020, but again the parties could not agree on whether defendants clarified how to apply the payments among the senior loan accounts. See PSMF ¶ 76; DOSMF ¶ 76. On August 6, 2020, Dinius wrote Global Growth Holdings's general counsel and asked for information about the payments made on May 1, 2020, and August 1, 2020. See PSMF ¶ 77; DOSMF ¶ 77.

On August 7, 2020, defendants' counsel responded with an email attaching payment advice that instructed how to allocate the August 1, 2020 payments but did not include payment advice for the May 1, 2020 payments. See PSMF ¶ 78; DOSMF ¶ 78. On August 11, 2020, plaintiffs' counsel replied and requested payment advice for the May 1, 2020 payments and calculations showing how the borrowers determined the amount of interest owed for the May 1, 2020 and August 1, 2020 payments. See PSMF ¶ 79; DOSMF ¶ 79. On August 16, 2020, defendants'

6

counsel responded with payment advice for the May 1, 2020 payments but did not provide calculations for how the borrowers calculated the interest due for the May 1, 2020 payments or the August 1, 2020 payments. See PSMF ¶ 80; DOSMF ¶ 80.

Plaintiffs could not reconcile the May 1, 2020 payment from AFA with the amount of payments shown in the payment advice and contend that there was a discrepancy of $14,222.42. See PSMF ¶ 81. Thus, plaintiffs kept the AFA payments in a segregated account. See id.

On August 20, 2020, plaintiffs' counsel emailed defendants' counsel that defendants' failure to provide calculations interfered with Dinius's ability to discharge his duties as Special Deputy Rehabilitator. See id. at ¶ 82. On August 24, 2020, defendants' counsel emailed a memorandum describing how defendants viewed the terms of the IALA concerning payment of interest on the senior loans and included a spreadsheet of their interest calculations for the May 1, 2020 payments and the August 1, 2020 payments. See id. at ¶ 83; DOSMF ¶ 83. In that memorandum, defendants stated that some of the affiliated loans scheduled as senior loans in Exhibit A of the IALA should have been scheduled as insurance hold co-related debt in Exhibit G, which was not subject to repayment of interest. See PSMF ¶ 85; DOSMF ¶ 85. Thus, defendants contended that the IALA required no interest on those loans. See PSMF ¶ 85; DOSMF ¶ 85. Defendants also stated that another set of loans to Lindberg's Maltese affiliates should have been listed as interest-free debt on "Exhibit I," but Exhibit I did not exist in the IALA. See PSMF ¶ 86; DOSMF ¶¶ 85, 86. Defendants also asserted that almost $600 million of additional debt included in the senior loans tranche should have been scheduled as interest-free. See PSMF ¶¶ 87–88; DOSMF ¶¶ 87–88.

Defendants admit that this memorandum was the first time they told plaintiffs of their position that some of the senior loans listed in Exhibit A should have been scheduled in other

7

exhibits as interest-free debt. See PSMF ¶ 89; DOSMF ¶ 89. The memorandum explained defendants' view that the IALA required interest payments to begin on May 1, 2020, and that the interest deferral period ended on January 31, 2020. See PSMF ¶¶ 90–91; DOSMF ¶¶ 90–91. Defendants contend that the IALA should have said that the deferral period was seven months, not six months, and that the failure of the IALA to do so was a typo. See PSMF ¶ 93; DOSMF ¶ 93.

Plaintiffs allege defendants breached the IALA in two ways. First, plaintiffs contend that the IALA required the first interest payment on February 1, 2020, and defendants made no payment by that date. See PSMF ¶ 95; DOSMF ¶ 95. Second, plaintiffs contend that even if payment of interest under the IALA was not due until May 1, 2020, the borrower defendants did not pay the full amount of interest due in their May 1, 2020 payments because the IALA would have required four months of interest from January 1, 2020, through April 30, 2020. See PSMF ¶ 96; DOSMF ¶ 96. Plaintiffs seek summary judgment for breach of contract. Plaintiffs also seek summary judgment on defendants' counterclaims for (1) breach of contract, (2) breach of the covenant of good faith and fair dealing, (3) breach of fiduciary duty, and (4) reformation based on mutual mistake. See [D.E. 90] 26–31.

Defendants move for partial summary judgment on plaintiffs' claims that defendants breached the IALA by failing to make a payment on February 1, 2020. See [D.E. 85]. Defendants contend that plaintiffs breached the IALA by accelerating the loans and suing for breach when no breach occurred. See PSMF ¶ 112; DOSMF ¶ 112. Defendants also argue that plaintiffs made statements in related MOU and bankruptcy litigation that the IALA did not require interest payments until the second quarter of 2020. See PSMF ¶ 120; DOSMF ¶ 120. Defendants assert that these statements are judicial admissions. See DOSMF ¶ 121. Plaintiffs respond that these

8

statements were a "scrivener's error" that plaintiffs' representatives corrected under oath before the parties began litigating these consolidated IALA cases. See PSMF ¶ 121.

## II.

Summary judgment is appropriate when, after reviewing the record as a whole, the court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Scott v. Harris, 550 U.S. 372, 378, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment must initially demonstrate the absence of a genuine issue of material fact or the absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Harris, 550 U.S. at 378. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

A genuine issue of material fact exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. See Anderson, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position [is]

9

insufficient . . . ." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that affect the outcome under substantive law properly preclude summary judgment. See Anderson, 477 U.S. at 248.

This dispute requires the court to interpret a North Carolina insurance contract, and the court applies North Carolina substantive law. Accordingly, this court must predict how the Supreme Court of North Carolina would rule on any disputed state-law issues. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). In doing so, the court must look first to opinions of the Supreme Court of North Carolina. See id.; Parkway 1046, LLC v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020); Stahle v. CTS Corp., 817 F.3d 96, 100 (4th Cir. 2016). If there are no governing opinions from that court, this court may consider the opinions of the North Carolina Court of Appeals, treatises, and "the practices of other states." Twin City Fire Ins. Co., 433 F.3d at 369 (quotation omitted). In predicting how the highest court of a state would address an issue, this court must "follow the decision of an intermediate state appellate court unless there is persuasive data that the highest court would decide differently." Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (quotation omitted); see Hicks v. Feiock, 485 U.S. 624, 630 & n.3 (1988). Moreover, in predicting how the highest court of a state would address an issue, this court "should not create or expand a state's public policy." Time Warner Ent.-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (cleaned up); see Day & Zimmermann, Inc. v. Challoner, 423 U.S. 3, 4 (1975) (per curiam); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

"Contract interpretation is a subject particularly suited for summary judgment disposal." Bank of Montreal v. Signet Bank, 193 F.3d 818, 835 (4th Cir. 1999). "Interpreting a contract

10

requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution." State v. Philip Morris USA Inc., 363 N.C. 623, 631, 685 S.E.2d 85, 90 (2009) (internal citation and quotation omitted). Under "the general law of contracts," a court gathers the purpose "of a written instrument . . . from its four corners." Ussery v. Branch Banking & Tr. Co., 368 N.C. 325, 336, 777 S.E.2d 272, 279 (2015) (quotation omitted). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." Crockett v. First Fed. Sav. & Loan Ass'n, 289 N.C. 620, 631, 224 S.E.2d 580, 588 (1976); see Goodman v. Resol. Tr. Corp., 7 F.3d 1123, 1126 (4th Cir. 1993); McGuire v. LORD Corp., 456 F. Supp. 3d 729, 739–40 (E.D.N.C. 2020).

Even if a contract is ambiguous, the court may grant summary judgment if extrinsic evidence resolves the ambiguity. See Goodman, 7 F.3d at 1126. "When an agreement is ambiguous and the intention of the parties is unclear, however, interpretation of the contract is for the jury." Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C., 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008); see Farmers Bank v. Michael T. Brown Distribs., Inc., 307 N.C. 342, 347–48, 298 S.E.2d 357, 360 (1983). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004).

Plaintiffs argue that defendants breached the IALA by: (1) missing the first payment due on February 1, 2020; and (2) underpaying the amount of interest due when defendants did make payments. See [D.E. 90] 8.

For their breach of contract claim, plaintiffs must forecast evidence of (1) the existence of a valid contract and (2) a breach of the contract's terms. See McLamb v. T.P. Inc., 173 N.C. App.

11

586, 588, 619 S.E.2d 577, 580 (2005); Cater v. Barker, 172 N.C. App. 441, 445, 617 S.E.2d 113, 116 (2005), aff'd, 360 N.C. 357, 625 S.E.2d 778 (2006) (per curiam); Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). A breach of contract occurs when there is "non-performance, unless the person charged shows some valid reason which may excuse the non-performance; and the burden of doing so rests upon him." Abbington SPE, LLC v. U.S. Bank, Nat'l Ass'n, 352 F. Supp. 3d 508, 517 (E.D.N.C. 2016) (cleaned up), aff'd, 698 F. App'x 750 (4th Cir. 2017) (per curiam) (unpublished); see Barbour v. Fid. Life Ass'n, 361 F. Supp. 3d 565, 572 (E.D.N.C. 2019); Cater, 172 N.C. App. at 447, 617 S.E.2d at 117.

## A.

The IALA states, inter alia:

> (a) [F]or the first six (6) month period following the Amendment Effective Date (the "Senior Loan Deferral Period"), each of the Senior Loans shall accrue interest at the Base Interest Rate as set forth herein, but the accrued interest on each Senior Loan shall not be payable and instead shall be added to the principal of the applicable Senior Loan upon the end of the Senior Loan Deferral Period; (b) after the Senior Loan Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate; (c) beginning February 1, 2020, interest on the Senior Loans shall be payable quarterly in cash at the Base Interest Rate as set forth herein.

[D.E. 94] 63–64. The Senior Loan Deferral Period began on July 1, 2019. See PSMF ¶ 57; DOSMF ¶ 57. As for plaintiffs' first breach of contract theory, plaintiffs argue that subparts (a) through (c) unambiguously require the first payment on February 1, 2020. See [D.E. 90] 9–10. Defendants respond that because subsection (c) says "payable quarterly," the IALA unambiguously did not require the first payment until May 1, 2020. See [D.E. 100] 6.

The court rejects both arguments. The IALA creates two reasonable interpretations for when the first payment was due. Either (1) the IALA made the first payment due on February 1, 2020, to include the outstanding one month's interest due at that time with the second payment to

12

follow three months later, or (2) the IALA made the first payment due on May 1, 2020, with the first payment to include the outstanding interest accrued since January 1, 2020.

As for extrinsic evidence, defendants argue that plaintiffs made judicial admissions in related MOU and bankruptcy litigation that the IALA did not require an interest payment until the second quarter of 2020. See PSMF ¶ 120; DOSMF ¶ 120. Plaintiffs respond that these statements were a scrivener's error that plaintiffs' representatives corrected under oath in depositions in the MOU action before litigating these consolidated cases. See PSMF ¶ 121; DOSMF ¶ 121.

The cited extrinsic evidence fails to resolve the dispute. First, even though, in January 2020, Dinius referenced a second quarter payment date, he stated April 1 or April 15 as the due date, not May 1, 2020. See [D.E. 98] 13. Dinius also corrected that date in early February 2020 after he reviewed the IALA. See id. at 12–13. Second, the statements made in the MOU litigation do not resolve the dispute because they also referenced principal payments due in the second quarter of 2020, which arguably contradicts the IALA's express terms. See id. at 14. Without more, defendants' extrinsic evidence fails to resolve the dispute about the first payment date.

Genuine issues of material fact exist concerning when the IALA required the first payment. Thus, the court denies both plaintiffs' motion for summary judgment and defendants' partial motion for summary judgment to the extent the parties sought summary judgment concerning the IALA's first required payment date.

## B.

The court's conclusion that genuine issues of material fact exist concerning the IALA's first required payment date does not preclude summary judgment concerning defendants' liability for breach of contract. Plaintiffs argue that if the IALA did not require the first payment on February 1, 2020, defendants still breached the IALA by underpaying the interest due on May 1, 2020. See

13

[D.E. 90] 11. Specifically, plaintiffs contend that defendants breached the IALAs by: (1) all defendants treating the six-month deferral period as a seven-month deferral period and not paying the January 2020 accrued interest, and (2) 15 borrower defendants failing to pay any interest on the senior loans because they unilaterally reclassified those loans as non-interest bearing. See id.

Defendants admit that they applied a seven-month deferral period because they read the "payable quarterly" phrase in subpart (c) to mean that only three months of interest was due on May 1, 2020, and thus the deferral period ran until three months before that payment date. See [D.E. 100] 8, 10. Defendants also admit that they unilaterally reclassified a subset of the senior loans as non-interest bearing, based on an alleged mistake in the IALA Exhibits. See id. at 13–21. Defendants argue that the IALA's ambiguity concerning potential accrued interest for January 2020 and the alleged mistakes in the IALA's loan tranches exhibits create genuine issues of material fact that preclude summary judgment on liability. See id. at 10–11.

The court rejects defendants' arguments. The IALA unambiguously defines the length of the deferral period, when interest is capitalized, and the date from which payable interest began to accrue. The IALA defines the Senior Loan Deferral Period as "the first six (6) month period following the Amendment Effective Date." [D.E. 94] 63. At the end of the Senior Loan Deferral Period, the interest that accrued during that period "shall be added to the principal of the applicable Senior Loan." Id. "[A]fter the Senior Loan Deferral Period, such capitalized interest shall bear interest along with the principal amount of such loan at the Base Interest Rate . . . ." Id.

On June 27, 2019, the parties executed the IALA. See id. at 62. The parties agreed to adjust the amendment effective date to July 1, 2019, based on Exhibit A including the outstanding balance of principal and interest owed on the senior loans as of June 30, 2019. See PSMF ¶ 57;

14

DOSMF ¶ 57; [D.E. 100] 8 n.5. Thus, the Senior Loan Deferral Period began on July 1, 2019, and lasted six months (i.e., until December 31, 2019).

Defendants argue that ambiguity exists about the length of the deferral period and cite testimony from Lindberg and defendants' corporate representative, Marc Greenspan ("Greenspan"). Lindberg testified that subpart (c) of the IALA gave an additional 30 days of "undefined term deferral" because the "payable quarterly" phrase in subpart (c) restricts payments to three months' worth of interest. [D.E. 100] 9–10; see [D.E. 92-15] 50–51. Greenspan testified that "[t]here's some ambiguity in the IALA." [D.E. 100] 10. "You cannot have a six-month period and then say February 1st is the initial payment because you've then capitalized six months . . . and then 30 days later, you're making a payment. . . . [Thirty] days is not a quarter." Id. at 10–11; see [D.E. 92-10] 52.

These bald assertions do not defeat the IALA's "express language." Crockett, 289 N.C. at 631, 224 S.E.2d at 588; see Goodman, 7 F.3d at 1126; McGuire, 456 F. Supp. 3d at 739–40. The IALA deferral period ran for six months and ended on December 31, 2019. Subpart (c) does not create an "undefined" deferral period. The term "shall be payable quarterly" establishes frequency of payment. See [D.E. 94] 63–64. The term does not define the amount due. Even if ambiguity exists about when the IALA required the first payment, the IALA is not ambiguous concerning when payable interest began to accrue. Indeed, defendants concede the distinction between first-payment-date ambiguity and interest-accrual-date ambiguity. See [D.E. 105] 4 ("[T]reatment of January 2020 interest could have been clearer. Nevertheless, Defendants' calculation of January 2020 interest does not prevent the Court from ruling on the question of whether payment was due February 1, 2020."). Under either interpretation of IALA's first payment date, non-deferred interest accrued during January 2020. Moreover, defendants did not make a payment on the

**15**

January interest on February 1, 2020, and defendants did not include January's interest in their May 1, 2020 payment. Cf. [D.E. 100] 8, 10. Thus, defendants breached the IALA.

The parties submitted tables reflecting the differences between defendants' payments and their obligations. See [D.E. 90] 12; [D.E. 100] 12–13; see also [D.E. 114]. Defendants argue that the discrepancies in these tables constitute genuine issues of material fact that the court cannot resolve at summary judgment. See [D.E. 100] 13.

The court rejects defendant's argument. Even if some discrepancies in the calculated interest amounts exist, see [D.E. 100] 21, those discrepancies do not preclude summary judgment for plaintiffs on whether defendants breached the IALA. The discrepancies concern damages.

## C.

Plaintiffs also argue that 15 defendants further underpaid their IALA obligations because they improperly treated some senior loans as interest free. See [D.E. 90] 13–17. Defendants respond with arguments concerning mutual mistake and AFA's reformation counterclaim. The court addresses the arguments together.

In August 2020, defendants explained for the first time their belief that the parties intended to classify additional senior loans listed in Exhibit A as interest free. Specifically, Lindberg and other corporate agents for defendants maintain that the parties understood these alleged mistakes in the exhibit lists. See [D.E. 90] 13–17; [D.E. 92-71] 3–6.

This court and the Fourth Circuit have discounted vague assertions of alternative agreements from Lindberg. See, e.g., Colo. Bankers Life Ins. Co., 60 F.4th at 152 ("Indeed, Lindberg's vague assertion about alternative financing arrangements represents precisely the sort of conclusory testimony that is, without more, insufficient to preclude granting a summary judgment motion." (cleaned up)). The court again concludes that Lindberg's vague assertions of

16

mistake and alternative agreements do not create genuine issues of material fact. Moreover, defendants do not present sufficient evidence to override the unambiguous listing of the loan tranches in the IALA Exhibits. See [D.E. 94] 108–12.

Next, defendants argue that a plain reading of the IALA bars summary judgment. See [D.E. 100] 21–22. As discussed, the court rejects this argument because even if the IALA is ambiguous on the required date of payment, it is not ambiguous on the date of payable interest accrual. Moreover, even if the parties dispute the precise amount of underpayment, defendants materially underpaid at least one month's interest for some loans, and even more for the loans that defendants unilaterally asserted accrued zero interest.

Defendants also argue that genuine issues of material fact exist concerning the defense of mutual mistake. See id. at 22–25. "A mutual mistake is one common to both parties to a contract wherein each labors under the same misconception respecting a material fact, the terms of the agreement, or the provisions of the written instrument designed to embody such agreement." Branch Banking & Tr. Co. v. Chi. Title Ins. Co., 214 N.C. App. 459, 463, 714 S.E.2d 514, 518 (2011) (cleaned up). There is "a strong presumption in favor of the correctness of the instrument as written and executed, for it must be assumed that the parties knew what they agreed and have chosen fit and proper words to express that agreement in its entirety." Id. at 464, 714 S.E.2d at 518 (cleaned up). A party seeking reformation due to mutual mistake must prove that the parties agreed upon a material stipulation to be included in the written instrument, that the parties mistakenly omitted the stipulation, and that because of the mistake, the written instrument does not express the parties' intention. See Branch Banking & Tr. Co., 214 N.C. App. at 464, 714 S.E.2d at 518. The party seeking reformation must prove the existence of the mutual mistake by "clear, cogent and convincing evidence." Wells Fargo Bank, N.A. v. Coleman, 239 N.C. App. 239, 249,

17

768 S.E.2d 604, 611 (2015) (quotation omitted). Moreover, a "unilateral mistake by a party to a contract, unaccompanied by fraud, imposition, undue influence, or like circumstances of oppression is insufficient to avoid a contract." Smith v. First Choice Servs., 158 N.C. App. 244, 249, 580 S.E.2d 743, 748 (2003) (quotation omitted).

Under North Carolina law, a party can use mutual mistake to either reform a contract or avoid it. See Marriott Fin. Servs., Inc. v. Capitol Funds, Inc., 288 N.C. 122, 135–36, 217 S.E.2d 551, 560 (1975); Herring v. Herring, 231 N.C. App. 26, 28, 752 S.E.2d 190, 192 (2013); Lancaster v. Lancaster, 138 N.C. App. 459, 465, 530 S.E.2d 82, 86 (2000); Mullinax v. Fieldcrest Cannon, Inc., 100 N.C. App. 248, 251, 395 S.E.2d 160, 162 (1990). "Defendants do not dispute that the IALA is a valid, binding, and enforceable agreement." PSMF ¶ 44; see DOSMF ¶ 44. Only AFA seeks reformation in its counterclaim. See PSMF ¶ 131; DOSMF ¶ 131. Thus, the court rejects defendants' arguments for mutual mistake as an affirmative defense to plaintiffs' claims for breach of the IALA.

As for AFA's request for reformation due to mutual mistake, the court rejects AFA's request. The evidence produced demonstrates (1) the parties exchanged questions while drafting the IALA and (2) defendants asserted post-ratification theories concerning their unilateral belief of possible errors. See [D.E. 106] 9–10 (summarizing deficiencies in defendants' evidence). Even viewing the record in the light most favorable to AFA, no rational jury could find mutual mistake. For example, the questions raised in the final stages of contract drafting relate to minor clarifications of the execution or amendment date, or non-material details concerning how to handle principal payments. See, e.g., [D.E. 92-15] 34; [D.E. 92-14] 36–39; [D.E. 100] 24. AFA, however, forecasts no evidence concerning the treatment of January 2020 interest or proposing a list of interest-free loans.

Rather than showing mutual mistake concerning any of the material terms, the evidence at best supports a theory of unilateral mistake. Even then, AFA only presents conclusory testimony and fails to show fraud, imposition, or undue influence necessary to void the IALA due to unilateral mistake. For example, Lindberg alleges that he was under pressure to sign the IALA quickly, but he cannot recall what specific mistakes each side allegedly understood before the parties signed the IALA. See [D.E. 92-15] 10–11. Instead, AFA only presents its understanding of what it "thought the agreement to be" or what it should have been. Crockett, 289 N.C. at 631, 224 S.E.2d at 588; see Goodman, 7 F.3d at 1126; McGuire, 456 F. Supp. 3d at 739–40. Moreover, AFA cites just one piece of evidence discussing potential material mistakes concerning the scheduling of zero-coupon loans. Lindberg testified that Dinius told him "[y]eah, we don't need this as a separate tab, let's roll this into the zeroes," allegedly indicating that the parties intended to include sets of loans in the Exhibit G list of zero-interest debt but did not do so because of mutual mistake. [D.E. 92-15] 32; see also id. at 33, 35, 66–68. AFA argues that the parties "did not understand or expect that the Senior Loans were not properly accounted for with respect to the zero coupon flow of the underlying loans." [D.E. 100] 24; see DOSMF ¶¶ 100–03 ("[E]veryone was aware of errors. . . .").

Even if the cited evidence constituted a mutual, general intent to include some subset of loans as interest free, the evidence does not reflect a mutual mistake concerning which loans the parties intended to include in the IALA's exhibit lists. Moreover, vague testimony that the parties knew that the IALA contained errors because of a short drafting period does not constitute a specific, agreed-upon material stipulation. Cf. Branch Banking & Tr. Co., 214 N.C. App. at 464, 714 S.E.2d at 518. At bottom, AFA's unsupported assertions fail to show "clear, cogent and convincing evidence" that each side agreed upon specific, material stipulations that the parties failed to include in the IALA. Coleman, 239 N.C. App. at 249, 768 S.E.2d at 611 (quotation

19

omitted). AFA's mutual mistake arguments provide no basis to override the IALA's express terms. Thus, AFA's affirmative defense of mutual mistake fails, and the court grants plaintiffs' motion for summary judgment on AFA's counterclaim for reformation based on mutual mistake.

No genuine issues of material fact exist concerning whether defendants breached the IALA. Thus, the court grants plaintiffs' motion for summary judgment on the issue of defendants' liability for breach of contract. The damages calculation remains a question for a later date and will require a factual resolution of the IALA's first payment date in order to calculate the amount owed as of the correct date.

### D.

Plaintiffs seek summary judgment on defendants' four counterclaims. See [D.E. 89]; [D.E. 90] 26–31. As discussed, the court grants plaintiffs' motion for summary judgment on AFA's counterclaim for reformation based on mutual mistake. Moreover, defendants fail to forecast evidence to support the remaining three counterclaims. Cf. [D.E. 100]. For the reasons stated in plaintiffs' brief in support of their motion for summary judgment, see [D.E. 90] 26–31, the court grants plaintiffs' motion for summary judgment on defendants' remaining counterclaims.[1]

Finally, plaintiffs request an order "allowing them to enforce their security interest in the Pledgor Defendants' Collateral" consistent with N.C. Gen. Stat. § 25-9-601(a)(1). [D.E. 90] 31–32. Section 25-9-601(a) permits a secured party to "reduce a claim to judgment, foreclose, or otherwise enforce the claim, security interest, or agricultural lien by any available judicial procedure . . . ." N.C. Gen. Stat. § 25-9-601(a)(1). Given that the court must have additional

---

[1] After briefing concluded, defendants filed a notice of decision in related cases and cite five state court orders from January and February 2024. See [D.E. 109]. The cited decisions are not informative.

Case 5:20-cv-00474-D Document 115 Filed 08/19/24 Page 20 of 21

proceedings to determine damages, the court denies plaintiffs' request for an order under section 25-9-601(a).

## III.

In sum, the court GRANTS plaintiffs' motion for summary judgment concerning defendants' liability for breach of contract and concerning defendants' counterclaims [D.E. 89], DENIES plaintiffs' request to foreclose on collateral, DENIES defendants' motion for partial summary judgment [D.E. 85], and DISMISSES WITH PREJUDICE defendants' counterclaims. The parties shall meet and confer concerning further proceedings consistent with this order and propose a schedule.

SO ORDERED. This _19_ day of August, 2024.

                                       JAMES C. DEVER III
                                       United States District Judge